Paul A. MAPES and Jane A. Bryson

v.

The UNITED STATES.

No. 403–77.

United States Court of Claims.

May 17, 1978.

Paul A. Mapes, pro se.

Theodore D. Peyser, Jr., Washington, D. C., with whom was Asst. Atty. Gen. M. Carr Ferguson, Washington, D. C., for defendant; Donald H. Olson and Marc Levey, Washington, D. C., of counsel.

Before DAVIS, NICHOLS and KASHIWA, Judges.

## ON PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT

NICHOLS, Judge:

This tax refund suit is before the court on the parties' cross-motions for summary judgment. At issue is the constitutionality of what plaintiffs characterize the federal tax system's "marriage penalty." Under existing provisions of the Internal Revenue Code, some married couples incur substantially greater personal income tax liabilities than they would if unmarried and filing as single persons. Plaintiffs contend that this discrepancy in tax liabilities constitutes a violation of the due process notions implicit in the fifth amendment and of the equal protection standards incorporated thereunder. We disagree and, as there are no triable issues of fact, grant defendant's motion for summary judgment.

Plaintiffs seek a refund of $1,220.10 for tax year 1976, which is the additional amount they paid to IRS as a consequence of being married and thereby precluded from filing separately under the tax schedule applicable to single taxpayers. Plaintiff Mapes' taxable income for 1976 was $16,-763.20. Plaintiff Bryson's taxable income was $15,890.17. Prior to filing their claim for a refund, plaintiffs calculated that under section 1 of the Code, if unmarried in 1976, Mr. Mapes would have incurred a total tax liability of $3,701 and Ms. Bryson's total tax liability would have been $3,611. The difference, which constituted their claim for refund, between the combined tax liability if unmarried ($7,312) and that incurred because they were married ($8,532.10) is $1,220.10. Plaintiffs are to be congratulated for the able way in which they have put a serious and important issue before this court.

It should be noted at the outset that not all married couples are penalized taxwise by reason of their status. To the contrary, many, if not most, married couples achieve

considerable tax savings through income-splitting on a joint return. Charts I and II at the end of this opinion are taken from plaintiffs' brief and reflect their calculation of the variable impact of the penalty or reward offered for marriage. It is when both spouses generate somewhat comparable incomes that the benefits of income-splitting cease to exist. As a general rule, two-income couples would benefit from filing separately and using the tax rates applicable to single persons. They are not, however, eligible to use these schedules, but are restricted to filing jointly under Code section 1(a) or separately under section 1(d). As plaintiffs observe, of course, the option to file under section 1(d) is of marginal value to the typical couple, even those with dual-incomes, because the total tax liability of married couples filing separately nearly always equals or exceeds the combined tax liability on a joint return.

While the Code provisions involved are loosely called a "marriage penalty," their effects are thus more complex in reality. We expect all persons to make all important decisions in life in light of their tax effect. For the tax-minded young man or woman, with a substantial income, the Code adds to the attractiveness of a prospective spouse without taxable income, and detracts from one with it. Thus the provisions may have an income-levelling effect. But we have no data showing that as yet they operate in that manner. Love and marriage defy economic analysis. As one of Gilbert and Sullivan's heroines sang many years ago:

> True love must single-hearted be—
> Bunthorne: Exactly so!
> From every selfish fancy free—
> Bunthorne: Exactly so!
> No idle thought of gain or joy,
> A maiden's fancy should employ—
> True love must be without alloy,
> * * *
> It follows then, a maiden who
> Devotes herself to loving you
> Is prompted by no selfish view!
> Men: Exactly so!

The humor of this was in the unattractiveness of the love object. But our Internal Revenue Code provides an opportunity to the young to demonstrate the depth of their unselfishness, however kind and beautiful the beloved may be.

Formerly society frowned upon cohabitation without marriage, assessing various punitive sanctions by law and custom against the partners themselves, and their innocent offspring. Most of these have now been eliminated in our more "enlightened" society. Cohabitation without marriage, and illegitimacy, or whatever it is now called, are said to be rapidly increasing. Certainly the tax-minded young man and woman, whose relative incomes place them in the disfavored group, will seriously consider cohabitation without marriage. Thereby they can enjoy the blessings of love while minimizing their forced contribution to the federal fisc. They can synthesize the forces of love and selfishness.

It is easier, however, to point out these effects, than it is to show how the Constitution forbids the Congress from achieving them in its revenue laws. The Supreme Court is not easily astonished by anything it finds therein. In *Commissioner v. Kowalski*, 434 U.S. 77, 95–96, 98 S.Ct. 315, 326, 54 L.Ed.2d 252 (1977), Justice Brennan said:

> \* \* \* [A]rguments of equity have little force in construing the boundaries of exclusions and deductions from income many of which, to be administrable, must be arbitrary. \* \* \*

Although their constitutional challenge primarily focuses on the section 1 rates, created by the Tax Reform Act of 1969, plaintiffs also contend that several other provisions similarly penalize working married couples. One of these provisions is section 141, which prescribes the standard deduction and low income allowances available to all taxpayers. This section is said to discriminate against married taxpayers because the maximum standard deduction

available to a married couple filing a joint return is always less than twice the maximum standard deduction for single taxpayers. Another such provision is section 42, which is applicable only to tax liabilities for the years 1976 and 1977. This section allows individual taxpayers to take an annual credit against their income taxes in an amount equal to the greater of two percent of taxable income up to $9,000 or $35 multiplied by each exemption claimed by the taxpayer. Unless the taxpayer is entitled to more than five exemptions, the maximum credit available under section 42 is $180. As interpreted by the IRS, this section limits married couples to a single combined credit of $180, even if both have taxable incomes exceeding $9,000. Two individual unmarried taxpayers would each be eligible for the maximum credit of $180 if they both had incomes in excess of $9,000. Thus, plaintiffs assert that the net effect of this interpretation is discriminatorily to impose a heavier tax burden on working couples, solely because they are married. Plaintiffs have limited their challenge to current section 1 rates and to section 42. They did not take the standard deduction in 1976, and therefore do not have standing to contest the constitutionality of section 141 as applied to dual income couples.

In reviewing the evolution of the tax rates in section 1 of the Code it appears that the pendulum at different times has swung to favor both married and single taxpayers, without ever quite reaching equilibrium. In fact, the perplexities of shaping a legislative scheme which distributes the incidence of the personal income tax equitably between married and single taxpayers have confounded Congress for many years. Before 1948, income was taxed on an individual basis, without regard to marital status. The loophole inherent in this set-up was that married couples fortunate enough to reside in community property states were able to split, on a 50-50 basis, the marital community's income, thereby enjoying lower graduated tax rates and reaping considerable tax savings relative to

their counterparts in noncommunity property states. Income-splitting in community property states was upheld in *Poe v. Seaborn*, 282 U.S. 101, 51 S.Ct. 58, 75 L.Ed. 239 (1930). The issue now before the court had its roots in the Revenue Act of 1948, which sought to neutralize the effect of income-splitting in community property states vis-a-vis other married couples, and to equalize geographically taxes paid by couples. The Act amended the Code to allow all married couples to file joint returns, treating the couples as if they consisted of two single individuals each of whom had one-half the couple's combined income. The net result was that married couples paid a tax equal to twice what a single taxpayer would pay on one-half of their total income.

One of the consequences of the 1948 amendment was that single taxpayers paid substantially higher taxes than did married couples with the same income. Under the prior rates a single person's tax could be as much as 40.9 percent higher than the tax paid by couples filing a joint return on the same amount of taxable income. *See* S.Rep.No.552, 91st Cong., 2d Sess. 260 (1969), *reprinted in Internal Revenue Acts: Text and Legislative History 1966–1970,* 1639, 1909. Convinced that this disparity in tax burden was excessive, Congress enacted a new single person rate schedule designed to provide a tax liability for single persons ranging from 17 to 20 percent above that of married couples with taxable incomes between $14,000 and $100,000. *See id.* At the same time Congress repealed the previous arrangement wherein couples had the option of filing jointly or of choosing the schedule applicable to single taxpayers The 1969 Act substituted four schedules: sections 1(a), applicable to married individuals filing joint returns; 1(b), applicable to heads of households; 1(c), applicable to unmarried individuals; and 1(d), applicable to married individuals not filing joint returns. The rates in section 1(d) are considerably higher than those in subsection (c). Apparently Congress precluded use of the lower

rates for single individuals in order to discourage married taxpayers from rearranging their finances and shifting income so as to avoid or lower their tax liabilities. *See Staff of the Joint Committee on Internal Revenue Taxation*, General Explanation of the Tax Reform Act of 1969 at 223 (1970).

Although the Tax Reform Act succeeded in removing the disparity in tax burden between married and unmarried individuals, it also created the marriage penalty, by preventing married couples from taking advantage of the lower combined rates applicable to unmarried taxpayers. While this creates some inequalities, perhaps, for two-income couples, we are persuaded that overall the legislation is constitutionally acceptable. In reaching this conclusion, we have determined that the challenged sections meet the rational basis test of *Dandridge v. Williams*, 397 U.S. 471, 485, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970) for purposes of equal protection analysis, and bear the required reasonable relation to a constitutionally objective under the due process clause of the fifth amendment. *See Williamson v. Lee Optical Co.*, 348 U.S. 483, 491, 75 S.Ct. 461, 99 L.Ed. 563 (1955). The principle of equal protection to some degree is infused into the fifth amendment concept of due process. *See Bolling v. Sharpe*, 347 U.S. 497, 499, 74 S.Ct. 693, 98 L.Ed. 884 (1954).

At this juncture we note that a suit strikingly similar to the one at bar was recently decided in the Northern District of Indiana and affirmed by the United States Circuit Court of Appeals for the Seventh Circuit, *Johnson v. United States*, 422 F.Supp. 958 (N.D.Ind.1976), *aff'd sub nom. Barter v. United States*, 550 F.2d 1239 (7th Cir. 1977), *cert. denied*, 434 U.S. 1012, 98 S.Ct. 725, 54 L.Ed.2d 755 (1978). This suit also was brought by married couples seeking a refund of taxes paid over and above the amounts for which they would have been liable if allowed to file under section 1(c). The *Johnson* plaintiffs raised the full gamut of arguments available for questioning the constitutionality of the provisions: *i. e.*, due process, equal protection, and even free

exercise of religious beliefs under the first amendment. The court found that the challenged rates do not offend the Constitution. We are in general agreement with the court's result and rationale, and could stop there except that the plaintiffs deserve to have their own arguments stated and discussed.

Plaintiffs first advocate that the penalty on marriage, because it burdens the fundamental right to marry, should be subjected to a strict scrutiny for purposes of equal protection and due process analysis. In making this argument, plaintiffs rely heavily on the recent Supreme Court decision in *Zablocki v. Redhail*, —— U.S. ——, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978). This case involved a challenge to the validity of a Wisconsin statute making court approval a prerequisite to marriage for each state resident who was under an obligation to support minor children not in his or her custody. In some instances, the statute operated to create an absolute bar to marriage, as when a resident was unable to demonstrate sufficient financial stability to satisfy the court that the minor(s) would not become a public charge. After reviewing prior cases establishing that the freedom to marry is a fundamental liberty, *see e. g., Loving v. Virginia*, 388 U.S. 1, 11–12, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); *Griswold v. Connecticut*, 381 U.S. 479, 486, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), the Court continued:

> By reaffirming the fundamental character of the right to marry, we do not mean to suggest that every state regulation which relates in any way to the incidents of or prerequisites for marriage must be subjected to rigorous scrutiny. To the contrary, reasonable regulations that do not significantly interfere with decisions to enter into the marital relationship may legitimately be imposed. *See Califano v. Jobst* [434 U.S. 47, 98 S.Ct. 95, 54 L.Ed.2d 228] 1977; n. 12 *infra*. The statutory classification at issue here, however, clearly does interfere directly and substantially with the right to marry. [98 S.Ct. at 681.]

In note 12 the Court elaborated upon the distinctions between *Califano v. Jobst*, 434 U.S. 47, 98 S.Ct. 95, 54 L.Ed.2d 228 (1977) and *Zablocki v. Redhail, supra*. *Jobst* concerned a challenge to sections of the Social Security Act providing that benefits to a dependent child would terminate upon marriage to an individual not eligible for social security benefits. In upholding the termination of benefits upon marriage, the Court stated that the "general rule is not rendered invalid simply because some persons who might otherwise have married were deterred by the rule or because some who did marry were burdened thereby." 98 S.Ct. at 99.

 We turn now to the question of whether strict scrutiny is the proper test for determining whether the section 1 rates or section 42 deny plaintiffs equal protection. The Supreme Court has recently reaffirmed that "equal protection analysis requires strict scrutiny only when the classification impermissibly interferes with the exercise of a fundamental right or operates to the peculiar disadvantage of a suspect class." *Massachusetts Board of Retirement v. Murgia*, 427 U.S. 307, 312, 96 S.Ct. 2562, 2566, 49 L.Ed.2d 466 (1976); *see San Antonio School District v. Rodriguez*, 411 U.S. 1, 16, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). Admittedly, the right to marry is a fundamental right. Nevertheless, we read the *Jobst* and *Zablocki* cases together to imply that the application of strict scrutiny is appropriate only where the obstacle to marriage is a direct one, *i. e.*, one that operates to preclude marriage entirely for a certain class of people, as in *Zablocki*. The effect of the rates in Code section 1 is somewhat analogous to the effect of the termination of social security benefits in *Jobst*: the elevated tax burden might in fact dissuade some couples from entering into matrimony, but does not present an insuperable barrier to marriage. More often it changes the relative attraction of different prospective spouses for the tax-minded individual wishing to marry. For many it provides an incentive to marry. The additional tax liability suffered by two-income couples who cannot avail themselves of the rates for single persons is an indirect burden on the exercise of the right to marry. It is suffered not for marrying but for marrying one in a particular income group. This does not rise to the level of an "impermissible" interference with the enjoyment of a fundamental right. If each plaintiff allowed the other to benefit from all the income both enjoyed, as married persons historically have done, they might derive a benefit from the marital relationship, financially speaking, that justified the extra tax, even without reverting to the common law position that the husband controlled all the income of both spouses.

In addition to the fundamental interest argument, plaintiffs assert a second ground for rigorously scrutinizing the challenged provisions. They contend that because the marriage penalty has a discriminatory impact on women it is based on suspect criteria, and cannot be upheld in the absence of a showing of governmental interests. It is plaintiffs' position that the Code implicitly treats wives as secondary earners and husbands as primary earners. That is, the rates embody a belief on the part of Congress that women are not financially autonomous and that they do not contribute substantially to the support of their families. The net outcome, it is urged, is that the tax rates discriminate on the basis of sex, a result which is prohibited under the rationales of such cases as *Weinberger v. Wiesenfeld*, 420 U.S. 636, 95 S.Ct. 1225, 43 L.Ed.2d 514 (1975), and *Frontiero v. Richardson*, 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973).

We are not, however, satisfied that section 1 of the Code, which is facially gender neutral, may be struck down on this ground. The essence of the discrimination argument is that the wife's "secondary" income is taxed at higher graduated rates when that income is aggregated with the income of the husband. This is said to burden the wife's constitutional right to pursue a career, contrary to *Traux v. Raich*, 239 U.S. 33, 41, 36 S.Ct. 7, 60 L.Ed. 131 (1915). It seems to us that the fatal flaw in this analysis is that the Code does not label

either spouse's income as primary or secondary, but simply provides for its aggregation on the joint return. It is as easy to argue that if the wife should earn a higher salary than her husband that his right to pursue an occupation is burdened by the higher marginal tax rates imposed once the income is aggregated. The Code simply does not differentiate on this basis, and its failure to do so is likewise not per se invidious discrimination on the basis of sex.

■ Even assuming, *arguendo*, that the rates might reasonably be attacked as founded on discriminatory stereotypes, the joint return system does not operate to the financial detriment of all women. It is evident that many benefit by the rates created in the statute. Congress discriminates against some women in favor of others, as it does against some men in favor of others. Whenever statutes have been invalidated for invidious discrimination on the basis of sex, it has been the case that all members of the class were burdened, and not simply a portion of the class. *See Weinberger v. Wiesenfeld, supra; Frontiero v. Richardson, supra; Reed v. Reed,* 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971); *Johnson v. United States, supra,* 422 F.Supp. at 968–69. There is, then, no basis for us to find that the provisions in question improperly discriminate against women.

A third contention offered by plaintiffs is that the tax rates in question are invalidated by *Hoeper v. Tax Commission of Wisconsin,* 284 U.S. 206, 52 S.Ct. 120, 76 L.Ed. 248 (1931). *Hoeper* adjudicated the constitutionality of a Wisconsin law requiring the aggregation of the separate incomes of spouses. The combined incomes were then taxed at rates higher than would apply if the taxpayers were single and filing separately. It does not control our decision to note that dissents in that period by the Justices who dissented in that case, Holmes, Brandeis, and Stone, are usually regarded as law today. In most respects, the Wisconsin law is on all fours with the scheme adopted under the Tax Reform Act of 1969. The Court majority concluded that the Wisconsin law was arbitrary and a denial of due process under the fourteenth amendment because it measured "the tax on one person's property or income by reference to the property or income of another." 284 U.S. at 215, 52 S.Ct. at 122. Plaintiffs argue that the present system, because so similar to that in *Hoeper* also deprives married couples of due process.

We find, however, that there are sufficient distinctions between the present system and that in *Hoeper* to justify upholding the current rates and filing elections. Principally, we rest on the fact that the Wisconsin law provided no alternative to that of taxation of combined income. The federal scheme, on the other hand, offers married couples the opportunity to file separately and each be taxed individually on his or her own income. Thus, the present provision does not altogether mandate that the tax on one spouse's income be measured by reference to the earnings of the other. It does not presume as the Wisconsin law was seen to do by Mr. Justice Holmes, dissenting, that husband and wife are one, and the husband the one. Although we recognize that in most instances couples will feel compelled to file jointly, in order to achieve a lower tax liability, we do not believe that *Hoeper* requires anything other than the statutory election to file separately. It does not, as a matter of constitutional right, dictate that working married couples must also enjoy the election to be taxed under the schedules available to unmarried taxpayers. *See also Johnson v. United States, supra,* 422 F.Supp. at 966–68.

Eliminating, then, issues of fundamental rights and of sex, not here applicable, the standard for testing the challenged provisions is whether they are reasonable, not arbitrary, and whether they "rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike." *Royster Guano Co. v. Virginia,* 253 U.S. 412, 415, 40 S.Ct. 560, 562, 64 L.Ed. 989 (1920). A panel of this court discusses the correct application of this standard to tax cases in *First National Bank of Oregon v. United*

*States* 571 F.2d 21 (1978). We need not repeat what is there cited and said.

In *San Antonio School District v. Rodriguez, supra,* the Court eloquently discussed the difficulties of invalidating tax legislation:

Thus, we stand on familiar grounds when we continue to acknowledge that the Justices of this Court lack both the expertise and the familiarity with local problems so necessary to the making of wise decisions with respect to the raising and disposition of public revenues. * * *No scheme of taxation, whether the tax is imposed on property, income, or purchases of goods and services, *has yet been devised which is free of all discriminatory impact.* In such a complex arena in which no perfect alternatives exist, the Court does well not to impose too rigorous a standard of scrutiny lest all * * fiscal schemes become subjects of criticism under the Equal Protection Clause. [Footnote omitted—Emphasis supplied] [411 U.S. at 41, 93 S.Ct. at 1301.]

The Court further noted that "within the limits of rationality, 'the legislature's efforts to tackle the problems' should be entitled to respect." *Id.* at 42, 93 S.Ct. at 1301.

In this setting, we examine the respective claims of the parties about the rationality and reasonability of the present taxation schedules and elections. A major criticism plaintiffs voice is that the legislative policy of taxing all married couples equally, regardless of whether their income is derived from the efforts of one spouse or of both, conflicts with the fundamental principle of progressive taxation, that of ability to pay. It is argued accordingly that there is no rational relation to a legitimate purpose, a point amply demonstrated by the uneven impact of the marriage penalty. For example, married taxpayers with one income save as much as $1,881 a year over two single taxpayers while dual income taxpayers with the same income may pay as much as $1,264 a year more than they would if they were single. Plaintiffs contend that this situation is hardly a rational reflection of Congress' desire to tax household economies stemming from marriage. Rather, to serve due process purposes, plaintiffs would have us require that all similarly-situated married couples incur tax obligations not greater than the tax burden imposed on two single individuals with comparable incomes.

Plaintiffs offer considerable support for the argument that the marriage penalty does not reflect taxation based on ability to pay, or an allocation of tax burden designed to tax fairly the household economies achieved by marriage. They directed us to one study actually showing an inverse relationship between living expenses and the disparity between the incomes of each spouse:

The tax provisions applying to one- and two-earner couples are identical; hence, if they have the same money income, the same number of exemptions, and the same deductions, they pay the same tax. This gives the wrong tax result, because the married couple with one spouse working has more tax-paying ability than the married couple with two spouses working. [G. Break and J. Pechman, *Federal Tax Reform, The Impossible Dream?* 34 (1975).]

Working couples have less financial ability to pay taxes than do single-income couples, principally because of the significant expenses of earning the second income, such as transportation, lunches, and clothing, which are not tax deductible. In reality, the two job couple is economically worse off. See generally Bittker, *Federal Income Taxation and the Family,* 27 Stan.L.Rev. 1389 (1975). The essence of plaintiffs' argument, then, is that the challenged provisions fail even the minimum scrutiny test.

Again, we cannot agree. Plaintiffs have demonstrated that the tax classifications used by Congress are imperfect and imprecise, at least to some degree. This, however, is not sufficient to justify invalidating the legislation: As the Supreme Court stated in *Dandridge v. Williams, supra.*

In the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has some

"reasonable basis," it does not offend the Constitution simply because the classification "is not made with mathematical nicety or because in practice it results in some inequality." *Lindsley v. Natural Carbonic Gas Co.*, 220 U.S. 61, 78 [31 S.Ct. 337, 340, 55 L.Ed. 369] \* \* \* [397 U.S. at 485, 90 S.Ct. at 1161.]

Although *Dandridge* addressed state legislation, the same principles are applicable to federal statutes under constitutional attack. *E. g., Richardson v. Belcher*, 404 U.S. 78, 81, 92 S.Ct. 254, 30 L.Ed.2d 231 (1971).

As defendant properly asserts, there cannot be a "marriage-neutral" tax system. The policy of taxing all couples with equal incomes equally, a major factor in the 1948 income-splitting provision, is not unreasonable. Nor is it unreasonable to attempt to tax the household economies enjoyed by married people. In certain instances these assumptions fail. *See Hearings before the House Ways and Means Committee on Tax Treatment of Single Persons and Married Persons Where Both Spouses are Working*, 92d Cong., 2d Sess. 76–77 (1972). This does not invalidate the overall scheme. *See Brushaber v. Union Pacific R.R.*, 240 U.S. 1, 25, 36 S.Ct. 236, 244, 60 L.Ed. 493 (1916), wherein the Court noted that "it is of course superfluous to say that arguments as to the expediency of levying \* \* \* taxes or of the economic mistake or wrong involved in their imposition are beyond judicial cognizance." Finally, we note that the legislature is entitled to make reforms on a piecemeal basis, and solve one inequity at a time, as it did in 1969, by providing relief for unmarried taxpayers. *See, e. g., Williamson v. Lee Optical Co., supra*, 348 U.S. at 489, 75 S.Ct. 461.

The solution advanced by plaintiffs to provide a more equitable system of taxation is to create a third option for married couples—the ability to take advantage of section 1(c) rates. Defendant's response to this is first to note that there is some concern by Congress that this would create the temptation to shift income in various ways to avoid the higher rates. Compare H.Rep. *See Staff of the Joint Committee on Internal Revenue Taxation's General Explanation, supra;* No. 1274, 80th Cong., 2d Sess., 21–22 (1948). Second, this approach would end tax equality among married couples with equal incomes. Finally, inequities would again exist among people residents of community property states and common law states.

■ In short, the foregoing serves to illustrate that tax disparities will exist no matter how the rates are structured. This is simply the nature of the beast. The tax law is complicated enough already without the added complexity a full solution to this problem would apparently require. We in the judiciary, are neither equipped nor inclined to second guess the legislature in its determination of appropriate tax policies. *See San Antonio School Board v. Rodriguez, supra.* Like the court in *Johnson*, we are satisfied that the present provisions pass a minimum rationality test, and should be upheld as constitutional.

■ One final point—plaintiffs have argued to us that their case is distinguishable from *Johnson* because of the existence of the oral ante-nuptial agreement entered into by them before their marriage in 1976. The terms of the agreement are that each spouse will manage his or her own income separately, each contributing equally to the expenses of maintaining their common home. Plaintiffs argue that the existence of this arrangement provides an even better reason for finding the statute unconstitutional, at least as applied to them. The difficulty is that even if this unusual arrangement creates an additional burden for these plaintiffs, there is certainly not the massive discrimination here that is envisioned in cases such as *Reed v. Reed, supra*, and *Frontiero v. Richardson, supra.* Plaintiffs admit they cannot describe the disfavored class as those who have made agreements like theirs. In fact, the plaintiffs' extra burden appears self-inflicted.

Accordingly, we hold that the section 1 rates and section 42 are constitutional. Plaintiffs' motion for summary judgment is denied and defendant's cross-motion for summary judgment is granted. The petition is dismissed.

## CHART I

### 1976 MARRIAGE PENALTY BY INCOME COMBINATIONS

| Husband's Adjusted Gross Income | Wife's Adjusted Gross Income | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Zero | 2,000 | 4,000 | 6,000 | 8,000 | 10,000 | 12,000 | 14,000 | 16,000 | 18,000 | 20,000 |
| Zero | Zero | Zero | −177 | −248 | −319 | −405 | −458 | −486 | −625 | −787 | −932 |
| 2,000 | Zero | 54 | 121 | 91 | 61 | −13 | −40 | −123 | −190 | −287 | −328 |
| 4,000 | −177 | 121 | 229 | 240 | 222 | 174 | 92 | 81 | 79 | 32 | −53 |
| 6,000 | −248 | 91 | 240 | 263 | 271 | 168 | 158 | 212 | 260 | 213 | 213 |
| 8,000 | −319 | 61 | 222 | 271 | 224 | 193 | 248 | 352 | 410 | 448 | 443 |
| 10,000 | −405 | −13 | 174 | 168 | 193 | 227 | 332 | 446 | 579 | 622 | 685 |
| 12,000 | −458 | −40 | 92 | 158 | 248 | 332 | 447 | 636 | 774 | 885 | 960 |
| 14,000 | −486 | −123 | 81 | 212 | 352 | 446 | 636 | 830 | 1,036 | 1,159 | 1,285 |
| 16,000 | −625 | −190 | 79 | 260 | 410 | 579 | 774 | 1,036 | 1,254 | 1,428 | 1,563 |
| 18,000 | −787 | −287 | 32 | 223 | 448 | 622 | 885 | 1,159 | 1,428 | 1,611 | 1,797 |
| 20,000 | −932 | −382 | −53 | 213 | 443 | 685 | 960 | 1,285 | 1,563 | 1,797 | 1,992 |

All calculations assume that each taxpayer elects the standard deduction. Computations do not include the 1976 General Tax credit. A minus sign indicates a tax reduction.

## CHART II

Differences Between The Tax Of A Married Couple Filing Joint Return
And The Combined Tax of Two Single Persons With The Same
Income Combination As The Married Couple—1976*

*Amount of Marriage Penalty By the Ratio
Of The Spouses' Separate Incomes In Dollars And
As A Percent Of The Joint Tax Liability*

| Joint Adjusted Gross Income | Tax Liability | 100/Zero | 75/25 | 50/50 |
|---|---|---|---|---|
| $ 4,000 | $ 54 | − 177/−327% | − 22/−40% | 54/100% |
| $ 8,000 | $ 691 | − 319/− 46% | 91/ 13% | 229/ 33% |
| $12,000 | $1,463 | − 458/− 31% | 151/ 10% | 263/ 18% |
| $16,000 | $2,244 | − 625/− 27% | 91/ 4% | 224/ 10% |
| $20,000 | $3,179 | − 932/− 29% | 184/ 5% | 227/ 7% |
| $24,000 | $4,289 | −1,264/− 29% | 213/ 5% | 447/ 10% |
| $32,000 | $6,992 | −1,881/− 26% | 429/ 6% | 1,254/ 18% |

*All calculations assume each taxpayer elects the standard deduction. Computations do not include the 1976 General Tax Credit. A minus sign indicates a tax reduction.