**Susan WATERS; Robert Leonhardt, Plaintiffs–Appellants,**

**v.**

**GASTON COUNTY, NORTH CAROLINA, Defendant–Appellee.**

No. 94–2472.

United States Court of Appeals, Fourth Circuit.

Argued May 1, 1995.

Decided June 28, 1995.

**ARGUED:** George Daly, George Daly, P.A., Charlotte, NC, for appellants. Grady B. Stott, Stott, Hollowell, Palmer & Windham, Gastonia, NC, for appellee. **ON BRIEF:** Charles L. Moore, County Atty. for the County of Gaston, Gastonia, NC, for appellee.

Before WIDENER, LUTTIG, and WILLIAMS, Circuit Judges.

Affirmed by published opinion. Judge WILLIAMS wrote the majority opinion, in which Judge LUTTIG joined. Judge WIDENER wrote a separate concurring opinion.

## OPINION

WILLIAMS, Circuit Judge:

Appellants Susan Waters Leonhardt and Robert Leonhardt (the Leonhardts) work as paramedics in the Emergency Medical Ser-

vices Department of Appellee Gaston County, North Carolina (the County). The Leonhardts filed this declaratory judgment action under 42 U.S.C. § 1983 (1988), four days before their wedding, alleging that the County's anti-nepotism policy (which barred spouses from working in the same department) violated the Fourteenth Amendment. After a bench trial, the district court found in favor of the County. We affirm.

### I.

In 1983, the County passed an anti-nepotism ordinance that prohibited employment of relatives by the County. This policy was extremely broad, and as a result, it was enforced haphazardly at best, with the County granting numerous exemptions to people not covered by the policy's "grandfather" clause. The County's uneven enforcement, not surprisingly, caused considerable resentment.

Seven years later, the County promulgated a new policy to supersede the original 1983 policy. This new rule was much narrower and permitted current employees to marry each other, so long as they were not employed by the same division or unit and provided that neither spouse had any supervisory authority over the other. This 1990 policy also was not perfect; the County granted some exemptions, and the policy did not specify whom the County would terminate when a conflict arose. Therefore, the County attempted one more revision effective April 9, 1992. The 1992 policy (the Policy) is the one at issue in this case.[1]

Robert Leonhardt began working for the County in March 1990 as an Emergency Medical Technician (EMT) in the County's Emergency Medical Services Department (EMS). Susan Waters joined the County as an EMT in July of that year. In October 1991, Leonhardt and Waters changed divisions within the EMS to become Paramedics instead of EMTs. In January 1993, Appellants announced their intention to marry, and, cognizant of the Policy, they requested Philip Hinely, the County Manager, to grant them an exemption. They were informed that no exemption would be given.

On March 23, 1993, Appellants filed this action against the County asserting that the Policy was unconstitutional on two alternative grounds. First, they alleged that it substantially burdened their Fourteenth Amendment due process right to marry without being narrowly tailored to effectuate a compelling governmental interest. Without satisfying the rigorous standard of strict scrutiny, Appellants argued, the Policy could not be allowed to stand. In the alternative, Appellants claimed that due to the numerous exemptions granted by the County, the Policy could not be rationally or unarbitrarily enforced consistent with the Equal Protection Clause of the Fourteenth Amendment.

Four days after this suit was filed, Leonhardt and Waters married. By mutual agreement of the parties, they were allowed to retain their jobs until the resolution of this action. After the parties completed discovery, the district court held a bench trial on October 5, 1994. By written opinion dated October 18, 1994, the district court ruled against the Leonhardts and for the County

---

1. In pertinent part, the Policy reads as follows:
   *Section 8. Employment of Relatives*
   (a) The employment by Gaston County of relatives is prohibited, with the following exception:
   (1) Permanent full-time County employees who marry while both are employed by the County will be allowed to continue as employees of the County provided that employment of couples within the same department is prohibited, and in no event shall an employee be allowed to supervise or make any employment decision with regard to a spouse.
   (2) In the event that employees within the same department are married, the employee(s) will be allowed 90 days to obtain a transfer to other County employment or resign. Employees in the same department may apply for advertised vacant positions in other County departments. In the event there is no vacant position available in another department for which the employee qualifies and it becomes necessary to terminate an employee under this provision, the department shall adhere to the following policy:....
   (J.A. 153.) The Policy then describes neutral methods of determining which employee shall be terminated.

on both counts. The Leonhardts timely appealed.

## II.

■ As stated above, the Leonhardts challenge the Policy under both a strict scrutiny and a rational basis theory. We review the district court's legal conclusions *de novo* and its factual findings for clear error. We address each argument in turn.

## A.

The Leonhardts first allege that the Policy intrudes on their fundamental right to marry under the Fourteenth Amendment. They argue that because the law infringes upon this right, it can only stand if it satisfies strict scrutiny—that is, if it is narrowly tailored to meet a compelling governmental interest.

■ It is well-settled law that the Constitution embraces a fundamental right to marry. This right was first explicitly recognized as a basic tenet of substantive due process in *Loving v. Virginia*, 388 U.S. 1, 12, 87 S.Ct. 1817, 1823, 18 L.Ed.2d 1010 (1967). Chief Justice Warren, writing for a unanimous Court, struck down Virginia's anti-miscegenation statute, holding that "[t]he freedom to marry has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness by free men." *Id.* The right to marry, it found, was too important to be constrained by artificial racial classifications.

The Supreme Court realized, however, that this right had its limits in *Zablocki v. Redhail*, 434 U.S. 374, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978). There, the Court invalidated a Wisconsin statute that required non-custodial parents paying child support to obtain leave of court before getting married. In doing so, it held that not every restriction on the right to marry violated the Constitution; rather, "reasonable regulations that do not significantly interfere with decisions to enter into the marital relationship may legitimately be imposed. The statutory classification at issue here, however, clearly does interfere directly and substantially with the right to marry." *Id.* at 386–87, 98 S.Ct. at 681 (citation omitted). In essence, the Court held that we should apply strict scrutiny only to regulations that "significantly interfere" with the right to marry. *See id.* at 388, 98 S.Ct. at 682 ("When a statutory classification significantly interferes with the exercise of a fundamental right, it cannot be upheld unless it is supported by sufficiently important state interests and is closely tailored to effectuate only those interests.").

In the wake of these decisions, several other circuits have considered anti-nepotism laws, and each has concluded that they do not so burden the right to marry as to trigger strict scrutiny analysis. The D.C. Circuit, for example, upheld the anti-nepotism provisions of the Civil Service Reform Act, 5 U.S.C. § 2302 (1988), in *Cutts v. Fowler*, 692 F.2d 138 (D.C.Cir.1982). Mr. and Mrs. Cutts worked for the Federal Communications Commission before their marriage. When Mr. Cutts was promoted to the position of Mrs. Cutts's direct supervisor, Mrs. Cutts was transferred to another position with less authority (although at the same pay grade). She filed suit, alleging that the transfer violated her right to marry. After quoting from *Loving* and *Zablocki*, the court went on to hold that

> the burden on the "right to marry" is attenuated and indirect. The anti-nepotism policy of the FCC did not prohibit the Cutts's marriage; it only prevented the employment of Mrs. Cutts in a situation in which she would necessarily have been subject to the supervision of her husband. That aspect of this case distinguishes it from cases in which direct burdens on the right to marry have been struck down as unconstitutional.

*Id.* at 141. Because the anti-nepotism policy only tangentially affected the Cutts's marriage, instead of totally prohibiting it, the court upheld the anti-nepotism provision.

Similarly, this rationale has led the Ninth and Eleventh Circuits to uphold municipal anti-nepotism policies. In *Parsons v. County of Del Norte*, 728 F.2d 1234 (9th Cir.), *cert. denied*, 469 U.S. 846, 105 S.Ct. 158, 83 L.Ed.2d 95 (1984), the court affirmed a county policy that prohibited Mrs. Parsons from working as a Bailiff/Vehicle Abatement Offi-

**426**

cer in the Sheriff's department when her husband was a Deputy Sheriff. Without much discussion, the court clearly held that "Parsons' right to marry or remain married is not threatened, nor unduly burdened," therefore, "[t]he strict scrutiny analysis is inapplicable because no fundamental right is implicated." *Id.* at 1237. Recently, the Eleventh Circuit decided *Parks v. City of Warner Robins,* 43 F.3d 609 (11th Cir.1995), upholding Warner Robins's anti-nepotism policy against a Fourteenth Amendment challenge from a member of its police department. Like the courts before it, the Eleventh Circuit held that the "policy does not directly and substantially interfere with the right to marry. [It] does not create a direct legal obstacle that would prevent absolutely a class of people from marrying." *Id.* at 614.

We find these decisions persuasive.[2] Unless a law interferes directly and substantially with the fundamental right to marriage, it is not subject to strict scrutiny.[3] Here, the County's policy is a work-related restriction with incidental effects on the Leonhardts's marriage. Although it may touch upon the marriage relationship between County employees in the same department, it does not "directly and substantially" interfere with that right by preventing those who wish to marry from doing so.[4] The Policy does not forbid marriage altogether (as in *Loving*) or forbid it without permission of the State (as in *Zablocki*). At most, it is an unwelcome hurdle, forcing one spouse to at-

tempt to transfer to another department within the County or to leave the County's employ altogether. We cannot conclude that the Policy sufficiently impacts a fundamental right so as to trigger strict scrutiny.

Because we conclude that the Policy does not significantly interfere with the fundamental right of marriage, we facially review the Policy to determine whether there was a rational basis for its passage. *See Parks,* 43 F.3d at 614–15 ("Because the [anti-nepotism] policy does not directly and substantially interfere with the fundamental right to marry, we subject the policy to rational basis scrutiny."); *Parsons,* 728 F.2d at 1237 ("Where fundamental rights are not substantially burdened the regulation will be upheld unless there is no rational basis for its enactment."); *Cutts,* 692 F.2d at 141 (applying a rational basis test when no fundamental right was affected). We have no trouble concluding that the Policy passes muster under a rational basis review. As has been stated before, anti-nepotism rules effectuate rational and laudable workplace goals:

> avoiding conflicts of interest between work-related and family-related obligations; reducing favoritism or even the appearance of favoritism; preventing family conflicts from affecting the workplace; and, by limiting inter-office dating, decreasing the likelihood of sexual harassment in the workplace.

---

**2.** Anti-nepotism laws have also been upheld against Fourteenth Amendment constitutional challenges in *Keckeisen v. Independent School District 612,* 509 F.2d 1062, 1065 (8th Cir.), *cert. denied,* 423 U.S. 833, 96 S.Ct. 57, 46 L.Ed.2d 51 (1975); *Sebetic v. Hagerty,* 640 F.Supp. 1274, 1277 (E.D.Wis.1986), *aff'd sub nom. Heyden v. Schoenfeld,* 819 F.2d 1144 (7th Cir.), *cert. denied,* 484 U.S. 899, 108 S.Ct. 235, 98 L.Ed.2d 193 (1987); and *Southwestern Community Action Council, Inc. v. Community Servs. Admin.,* 462 F.Supp. 289, 297–98 (S.D.W.Va.1978).

**3.** For example, we have held that "rational basis review [was] appropriate" to review the denial of unemployment benefits to a wife who quit her job to move to a new locality with her husband because the denial did not "'directly and substantially' interfere with the fundamental right to marry." *Austin v. Berryman,* 862 F.2d 1050, 1055 (4th Cir.1988), *vacated on reh'g en banc,*

878 F.2d 786, 787 (4th Cir.) (adopting panel opinion on this issue), *cert. denied* 493 U.S. 941, 110 S.Ct. 343, 107 L.Ed.2d 331 (1989).

**4.** The Leonhardts claim that two couples aside from themselves, Bianca Weant & Terry Bagley, and Darren Ledford & Candace Cochran, were prevented from marrying because of the Policy. This is not altogether true.

At trial, Bianca Weant testified that she and Terry Bagley were still married to other people when they started working for the County. They could not get married without obtaining divorces. Additionally, Terry Bagley was a volunteer for the County, so the Policy did not apply to him anyway.

Darren Ledford testified that he and Candace Cochran ended their relationship after being denied an exemption from the Policy. However, he blamed the breakup of their relationship on "other circumstances." (J.A. 54.)

*Parks,* 43 F.3d at 615. Therefore, we hold that, on its face, the Policy is rationally related to a legitimate governmental interest, and, as a result, is constitutional.

### B.

The Leonhardts next argue that even if the Policy is constitutional as written, it has been applied in such an arbitrary and irrational manner that it violates the Equal Protection Clause. Specifically, they allege that the County's egregious history of exempting couples from the reaches of the anti-nepotism policy since its original adoption in 1983 makes it "substantively arbitrary to allow Gaston County to apply the Policy to [the Leonhardts] after [the County] has so often waived or ignored previous violations." *Opening Brief for Plaintiffs–Appellants* at 16. We disagree.

■ Were we to accept the Leonhardts invitation to examine every exemption granted since 1983, their position might be stronger. However, the district court's factual finding—that the Policy was intended to supersede all previous policies—is clearly supported in the record. Philip Hinely, the County Manager, confirmed at trial that "one of the reasons for adopting [the 1992 Policy] was to correct all of these past events of family members being married working in the same department and to try to prevent that in the future." (J.A. 68.) By reformulating the Policy, the County established its intent to pursue a course of strict enforcement. With this fact in mind, the district court concluded that it should confine its Equal Protection review to exemptions made after the County adopted the Policy. As the district court said, if we were to ignore this legislative action, "[t]he County would be eternally plagued by its past mistakes as its past errors would always invalidate any new policy designed to correct flaws in county government." (J.A. 165.) We agree that the law must allow the County the flexibility to correct its earlier mistakes, and thus limit our review to exemptions made after April 9, 1992.

At most, the Leonhardts have alleged two violations of the Policy. The Leonhardts claim that the County Manager's recent wedding made him a violator of the Policy because his new sister-in-law is an employee of the County Health Department. This relationship would not violate the Policy, however, because the County Health Department is a separate department from the County Manager's Office.[5] Consequently, the County Manager's marriage fits within the exception to the anti-nepotism rule under § 8(a)(1) of the Policy. *See, supra,* n. 1. The Leonhardts also allege that a recent marriage turned two women employed by the County into sisters-in-law, because they are now married to brothers. Assuming that this instance was a violation of the Policy, we do not believe that it reflects an arbitrariness so pervasive as to render the entire statute unconstitutional. For instance, the Supreme Court has held that the selective enforcement of a recidivist statute was not in itself a violation of the Equal Protection Clause. *Oyler v. Boles,* 368 U.S. 448, 82 S.Ct. 501, 7 L.Ed.2d 446 (1962). In *Oyler,* the prosecutor was required by statute to file a stipulation that would trigger an enhanced penalty when a conviction would result in a third punishable offense. Oyler alleged that the prosecutor's selective enforcement of his duty violated the Equal Protection Clause. The Supreme Court disagreed, stating that "the conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation" unless "selection was deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification." *Id.* at 456, 82 S.Ct. at 506.

■ We find neither evidence of selective enforcement under the Policy, nor evidence of selective enforcement based upon impermissible considerations. If it is true that the County Manager allowed one violation of the policy, this single violation is simply "the exercise of some selectivity in enforcement" that alone does not embody a constitutional violation. Accordingly, the single alleged violation of the Policy is not sufficiently egre-

---

**5.** Additionally, the County Health Department is a state agency over which the County Manager has no supervisory authority.

gious to render the Policy unconstitutional in its application.

### III.

For the foregoing reasons, the judgment of the district court is affirmed.

*AFFIRMED.*

WIDENER, Circuit Judge, concurring:

I concur in the result.